[No. 30532.   Department Two.   September 14, 1948.]

ROY M. RUMFORD *et al., Respondents,* v. MAX EDGAR SNIDER *et al., Appellants.*[1]

[1]Reported in 197 P. (2d) 446.

*Cheney & Hutcheson,* for appellants.

*Harry Hazel,* for respondents.

ROBINSON, J.—This is a case in tort arising out of a head-on collision between a 1946 Packard car and a truck and trailer loaded with steel rails and other steel products, the truck, trailer, and contents weighing about seventy thousand pounds.

The collision occurred at about four o'clock on the morning of November 28, 1946, about eight and one-half miles north of Goldendale on state highway No. 8, Federal 97, commonly known as the Satus Pass road. The damage to the truck and trailer was substantial, although trivial when compared with the damage to the Packard car and its occupants. The car was practically demolished. Its driver, Roy M. Rumford, an ex-pilot in the army air force, was grievously injured. His wife also received severe injuries. Their two-month-old son Richard was so seriously injured that he died during the day. Their four-year-old son Dale suffered a broken back and other permanent injuries. Mrs. Rumford's sister, Mrs. Winifred Mann, suffered no injury other than shock.

The complaint pleaded, in four causes of action, that the truck and trailer were being operated by the defendant Snider for the use and benefit of the defendant United Truck Lines, Inc., and within the scope of his authority as its agent, and that the collision was caused by Snider's negligence and carelessness,

"(1) In that the defendant MAX EDGAR SNIDER failed and neglected to yield the right of way to plaintiff's automobile approaching from the opposite direction;

"(2) In that the defendant MAX EDGAR SNIDER, at the time and place of said collision, was operating defendants' truck wholly upon his left hand side of said highway;

"(3) In that the defendant MAX EDGAR SNIDER failed and neglected to keep a proper lookout for vehicles coming in the opposite direction, particularly plaintiff's automobile;

"(4) In that the defendant MAX EDGAR SNIDER failed and neglected to keep defendants' truck under control;

"(5) In that the defendant MAX EDGAR SNIDER failed and neglected to give *any timely and visible or audible signal or warning of the presence of defendants' truck upon the east lane of said highway*;

"(6) In that the defendant MAX EDGAR SNIDER when he saw, or by the exercise of reasonable care should have seen and known, that there was danger of a collision with plaintiffs' automobile, failed and neglected to return defendants' truck to his right hand lane of travel upon said highway and failed and neglected to exercise ordinary care to avoid such collision when, by the exercise of ordinary care, he could have done so." (Italics ours.)

The complaint alleged that permanent injuries were suffered by Lieutenant Rumford, as follows:

"(1) The skin graft on the right knee has healed with much scar tissue, the skin over the area of the scar is extremely thin and, upon any strain or undue flexion has, and will in the future continue to, break open and expose the patella and surrounding flesh; that said condition is incurable, permanently painful and will require perpetual wearing of protective devices and pads, preventing said plaintiff from engaging in any occupation requiring more than slight strain or flexion of the knee;

"(2) The right knee has been rendered extremely weak, due to fiberlation of the quadriceps muscle, and the circumference of said knee has atrophied approximately one inch;

"(3) Partial deafness of both ears, more pronounced in the right;

"(4) Periodic stiffness of the neck;

"(5) Periodic pain in the proximal interphylangeal side of second finger on left hand."

It was further alleged:

"That, at the time of said collision, the plaintiff was on terminal leave from the United States Army Air Forces in which he held the rank of first lieutenant; that he has since

been discharged and offered an opportunity to re-enter active service at approximately $500.00 per month, including subsistence; that, prior to said collision, it had been plaintiff's intention to pursue a military career in the service of the United States, but, solely because of the injuries and damages sustained by him as a result of the carelessness and negligence of defendants as aforesaid, plaintiff is presently unable to pass the physical requirements of such service and will never be able to do so."

It was further alleged that, supplementing treatment in several army hospitals, Rumford was compelled to personally incur medical, surgical, and hospital expenses amounting to $305.87, and would be compelled to expend further sums in an amount not definitely known, but not less than $500. It was further alleged that the plaintiffs' car was damaged in the sum of $2,430, and there was other property of plaintiffs destroyed or damaged of the value of $454. Wherefore, plaintiffs prayed for a judgment on their first cause of action in the sum of $28,689.87.

The second cause of action specifically alleged more than twenty injuries to Mrs. Rumford, some of which, including a broken ankle, are permanent in their nature, and that said injuries necessitated the expenditure of $1,249.09 for medical, surgical, and hospital services; and it was further alleged that expenditures of not less than $350 for such services would still be required. The prayer of the second cause of action was for recovery of $11,599.09.

In the third cause of action, the plaintiffs, as guardians *ad litem* of their four-year-old son Dale, alleged that, as a result of the negligence of the defendants, he received the following injuries:

"Laceration on back of head; bilateral fracture of both clavicles; fracture of the second, third, fourth and fifth dorsal vertebrae and a severe nervous shock;

"That in an effort to cure and heal said injuries said Roy DALE RUMFORD was required to remain in the Goldendale Hospital until December 2, 1946, during which time he was required to be placed in a hyperextension board; he was transferred to St. Elizabeth's Hospital on December 2, 1946, where he remained until the latter part of January, 1947; was required to remain in traction until January 15th, 1947,

when a body cast was applied and was required to be worn for four months when a Taylor Brace with a cervical attachment was applied, which brace is now being worn and will be required for an indefinite period.

"That as a direct and proximate result of said injuries and of the negligence and carelessness of defendants as aforesaid, the said ROY DALE RUMFORD has sustained lasting and permanent disabilities as follows:

"(1) A fusion of the third and fourth dorsal vertebral bodies;

"(2) A compression of the bodies of the fourth and fifth dorsal vertebrae in which is now an amount of early callous formation with kyphosis and scoliosis;

"(3) An increasing deformity of the upper back during his growing years;

"(4) A disturbance of growth centers, resulting in unequal rates of growth;

"(5) Fiberitis, arthritis, a diminution of the size of the chest and a general disturbance of the body mechanics, producing causes for innumerable future difficulties and permanent total physical disability."

It was further alleged that plaintiffs had incurred medical, surgical, and hospital expenses with respect to Dale amounting to $1,154.07, and that further expenditures on his behalf will be required of not less than $5,000. Plaintiffs prayed for recovery on this cause of action in the amount of $56,154.07.

For their fourth cause of action, the plaintiffs, incorporating the charges of negligence hitherto detailed, alleged that, as a result thereof, their two-month-old son Richard Rumford received injuries from which he died during the day, to the plaintiffs' damage in the sum of $5,000, and that they had necessarily incurred certain ambulance charges and other expenses in connection with his injury and death. Recovery of $5,141.40 was prayed for in this cause of action.

There is undisputed evidence in the record that, on November 26, 1946, Lieutenant Rumford, who had enlisted in the army air force in 1940, had served as pilot of B-25s and copilot of B-29s throughout the war, and had recently concluded his terminal leave, left Los Angeles, California, about six a.m., to drive to his home near Toppenish, Wash-

ington. With him, as heretofore stated, were his wife, their four-year-old son Dale, their two-month-old baby Richard, and Mrs. Mann, his wife's sister. After reaching San Francisco, they continued north on Route 101, commonly known as the Redwood highway. They stopped for the night at an auto camp a few miles south of Eureka, California. They resumed their journey at about seven-thirty a.m. on November 27th. At Crescent City, California, they left Route 101 and took the road to Grants Pass, Oregon. At Crescent City, Mrs. Rumford took over the wheel and drove for two and one-half or three hours. It was foggy from Grants Pass to Portland. They reached Vancouver, Washington, about midnight, and, after stopping there for coffee and sandwiches, they continued along the Columbia river on the North Bank highway, stopping for gas at Bingen. At Maryhill, they left the river road and turned north on the Satus Pass highway. They passed three cars, heading north, when making the turn at the foot of the hill, and saw no other traffic up to the time of the collision, which occurred about eight and one-half miles north of Goldendale.

Lieutenant Rumford testified, in part, as follows:

"Q. And from the time you passed those cars up to the time of this collision, what was your physical condition, as to whether you were sleepy or alert, or what was that? A. I don't recall of being sleepy at any time during the trip. When we came to Portland we were debating on getting a room and staying all night at Portland because of the lateness of the hour and continuing the driving in the morning, but beings that none of us were tired, and being so close to our destination we decided to proceed. When we stopped for gas at Bingen we were all out of the car. My wife and sister-in-law were wearing suits and dresses and sweaters. The temperature was fairly close to freezing and very damp, of course, because of fog. I was wearing pinks and greens. Q. What do you mean by 'pinks and greens'? A. Green shirt and pink Army trousers, officer's equipment. And we were naturally very cold and thoroughly awakened at Bingen. The excitement of being that close to home, my wife and I not having been home for— since August of 1945, and Mrs. Mann, I believe, approximately two years, the excitement of getting that close to home we were not in the least sleepy. Q. Had you been

carrying on a conversation right up to the point of the collision? A. We had. Q. Now, what was the condition of your automobile with particular reference to its headlights? A. Headlights and every other part of the automobile were in perfect condition. Q. How many miles had that car been driven up to the point of collision? A. I believe it was right at 10,400. Q. And what was the condition of the brakes on the automobile? A. Perfect. Q. Were they undersized or medium or oversized brakes? A. The brake drums on the front wheels were made for the car. They were ten inches. The brake drums on the rear wheels were made for the eight cylinder or larger Packard, and they were eleven inches. They would be considered oversized brakes for a car of that weight. Q. What was the condition of the tread on your tires? A. Practically new. Q. Had you experienced, we will say from Goldendale to the point of collision, any slipperiness of the road or had you skidded? A. None whatever. Q. Had you discerned any ice on the road up to the time of the collision? A. No. . . .

"Q. Will you tell the jury the position of the occupants of the car at the time of the impact? A. The position? Q. Yes. A. I was driving, my wife was in the center of the front seat, Mrs. Mann was on the right of the front seat, Dale was in the right side of the back seat asleep on the seat. The space between the back seat and the back of the front cushion was filled with suitcases and covered over with quilts. It made a bed for the boy. Q. Do you mean the baby? A. No Dale, the boy. Q. Oh, Dale, the boy? A. Yes. And Dickie was in his bassinet immediately behind me. Q. Now, will you tell the jury what happened after you left Goldendale. First, about what time of the morning did you get to Goldendale? A. I don't recall the time as we went through Goldendale, although it must have been somewhere around four o'clock. Q. Now, tell the jury what happened from then on up to the time of the collision. A. *We proceeded out of Goldendale in a normal manner driving at approximately thirty to thirty-five miles an hour.* The road was wet, although it hadn't been slippery. We had not observed any slipping or sliding up to this time. The yellow line in the middle of the highway had been fairly newly painted. It was very bright and very easy to follow the line. There was snow along the edge of the road, which made the edge of the road very visible. We were driving around a long gradual curve to the left when suddenly there were a pair of lights snapped on approximately forty feet immediately in front of us in my lane of

traffic. At the time the lights were snapped on I could discern that it was a large truck, that it was red in color, had a square radiator, that it was in my lane of traffic, and that its right front wheel was somewhere around two to three feet inside of my lane, and that the truck was moving slowly enough that it could not do anything to materially avoid the collision. . . .

"MR. HAZEL: (Q) Will you continue, Mr. Rumford, please. A. It was immediately apparent that the truck could not do anything to materially avoid the collision and that it would be up to me since he was completely in my lane of traffic. *I throwed a half turn into the wheel to the left trying to make his lane and immediately or simultaneously I applied the brakes.* The car did not respond to the turn. There was an apparent response to the turn of the wheel just before we hit. I believe this was due to the fact that the truck was moving to its left, or my right, which made it appear that I had succeeded in making a turn to my left, I wouldn't know how else to explain the apparent movement of my car to the left. . . .

"MR. HAZEL: (Q) What part of your car struck the truck? A. The crankshaft of my car, the very center line of my car came in contact with the right spring shackle of the truck. Q. Now, just at the time you say that these lights flashed on, was there anything said by any occupant of your car? A. Both Mrs. Mann and myself saw the truck at the same time. I presume my wife did also, although she doesn't remember it. At the time the lights were snapped on Mrs. Mann said, 'Oh, Roy, there's a truck.' We both saw it at the same time. Prior to that time there had been no indication of a light. All the other cars we met on the road you could see their lights glowing for three hundred yards. *Up to the time the lights were pulled on there was no indication of any object in the road whatsoever.* Q. Were you rendered unconscious by the collision? A. I wasn't. Q. How long did you remain conscious? A. I would estimate that it wasn't more than five minutes at the most. Q. What happened during that five minute interval after the collision and before you lost consciousness? A. Immediately after the collision there was dead silence, there wasn't a sound. I looked around. I saw Winifred leaning against the door on her side. The truck had a light on. I don't know where that light was, although I believe it was high up on his left side of his cab, and in the reflection of the light I could see that her face was deadly white. My wife sitting next to me was thrashing her arms around. Q. What happened

to your son Dale? A. I couldn't see in the back seat. I don't know what was going on back there. The front seat of the car broke loose and was slid forward, the engine passed under the floorboards, my knees were jambed up under the dashboard by the engine passing under the floorboards. The wire shorted out and the last I remember I was pulling at my knees and my feet trying to free myself from the wreckage. Q. And what happened when you next regained consciousness; where were you? A. That and the next thing I remember was that I was lying in the highway with a pile of blankets over me. Q. And what happened from there on in? A. While I was still in the car I remember telling the truck driver that there were cars behind me and after I was out of the car the patrol came by and the patrolman—I didn't know it was him at the time but a man came by and I told him to take the blankets off of me and put them on my wife." (Italics ours.)

Mrs. Rumford remembered nothing which occurred after passing Maryhill.

Mrs. Mann testified, in part, as follows:

"Q. Do you recall leaving Goldendale? A. No. Q. All right, now, I would like to have you tell us what you remember about the accident, just describe in your own way what took place; that would be, of course, immediately before and at the time of the accident. A. *We were just driving along in the fog slowly and watching the yellow line, and suddenly there were lights ahead of us on our side of the road, and it was so very close that there was nothing to do but run into it. I could tell it was a truck, and I said to my brother-in-law that that truck is on our side of the road.* After that I lost consciousness, whether the truck struck me or whether it frightened me and I lost consciousness, I don't know, but after I saw the truck lights I don't remember anything until I became conscious again. Q. *Now, what was the first knowledge that you had of the presence of this truck ahead of you on your side of the highway? A. We suddenly saw lights in front of us. Q. How long would you say before the crash was it; was it just right now, instantly, or how? Give the jury your best recollection. A. It was practically instantly, we saw them and that was it.* Q. I see. I believe you fainted then, did you? A. Either that or the impact of the crash rendered me unconscious, I don't know. Q. *Well, prior to this sudden flash of light, did you have any knowledge at all that this*

*truck was ahead of you? A. No. Q. Were there any lights visible prior to this flash-on of the lights? A. No. Q. Now, I would kind of like to know what was the condition of yourself, for instance, as to being asleep or awake. Were you watching the highway or not? A. I was. We were awake. We had been visiting. All three of us were awake. Q. Yes. I would like to have you tell us what was the condition of Mr. Rumford as to whether he was awake and alert and what he was doing, as far as you could tell in your observation and conversation? A. He was awake and alert and we had been speaking about the fact that we would be home for breakfast Thanksgiving morning, and we were that close to home. Q. I see.* And had you stopped for gas at some place some miles back from this— A. Yes, we had. Q. —scene of the accident? A. Yes, we had. Q. What became of you, if you know, immediately after the accident; were you taken away from the scene of the accident? A. Yes, when I regained consciousness I was sitting in the road beside the car to the outside of the road and as I awoke my lap was full of blood and my sister lay at my left with blood streaming out of her head, and Dale lay at my left side and sort of whimpered and was bloody and someone was there with me and Dale and I know it was a woman and a man from their voices and they took me to the hospital. Q. You, of course, didn't make any investigation and try to take note of anything at the time of the accident? A. No." (Italics ours.)

On cross-examination, Mrs. Mann testified, in part, as follows:

"Q. Do you remember about when Roy Rumford started driving during the afternoon? A. No, I didn't. I didn't pay too much attention to those times. I know my sister relieved him at the wheel for a time but what time I can't say. Q. Your brother-in-law drove most of the time? A. Yes, sir. . . . Q. Immediately before the collision were you talking with each other? A. Yes, sir. Q. You were engaged in conversation? A. Yes, sir. Q. And Roy was engaged in conversation with you? A. Yes, sir. Q. *How far away would you say that you were from the truck when you first saw it? Of course, you could only testify as to you, yourself. A. It was terribly close, closer than that wall. Q. Was it very foggy at that time? A. Yes, sir. Q. About medium fog? A. I don't know how to describe fog by medium or thick, but it was quite foggy. Q.* About how far

could you see other objects with the fog condition as it was at that time? A. I didn't particularly pay any attention. I watched the road but I wasn't looking for the objects, and I can't give you any estimate on that. Q. You couldn't give any estimate? A. No, sir. Q. *Could you give me an estimate on about how far away the truck was when you first saw it? A. Closer than that wall, sir. Q. Closer than the wall? A. Closer than that, yes. Q. Could you estimate it in yards or feet? A. No, sir, anything any more than a three foot dress length doesn't mean a thing to me in yards and feet. Q. What is that? A. Anything further than a three foot dress length doesn't mean a thing to me in yards and feet. It was closer than that wall. . . .* Mr. Hutcheson: (Q) *In other words, you are admittedly not much of a judge of distance? A. No, sir, not in feet. I can tell you by pointing but not in feet. Q. Could you be any more definite than that? You say that it was less than the length of this room. Could you say what portion of the length of the room that it was? A. No, I would say that it was closer than the length of this room. Q. It would be approximately the length of this room? Q. Closer than the length of this room. Q. How much closer? A. Well, not any more closer than the middle of those seats, it was the middle of those seats there. It was closer than that wall. Q. It was almost as far away as the length of this room. A. It wasn't as far away as the length of this room. Q. Of course, that doesn't tell me anything. Can you be any more definite than that? A. That is all that I—* The Court: *She has already said from the witness chair to the seats. Now, if you would like to have it more specific and take measurements, we can step that off; but I think that is about as close as the witness could give it.* Mr. Hutcheson: (Q) *As I understood you, you didn't say to the seats, but you said to the middle of the seats? A. Yes, sir. Q. That is, beyond this rail here in the courtroom to the middle of the seats? A. Yes, sir. Q. What lights did you observe on the truck? A. Two headlights. Q. Anything else? A. No, sir. Q. Did you observe the spotlight? A. There was none. Q. Did you observe the marker lights? A. There was none. Q. You didn't see any marker lights on it? A. No, sir.*" (Italics ours.)

Defendants' answer denied the basic allegations of the plaintiffs' complaint and pleaded an elaborate affirmative defense. Since it is stoutly contended on this appeal that

this defense was established as a matter of law, we quote the defendants' affirmative pleading, as follows:

"For further answer and for their affirmative defense herein, defendants allege:

"(1) That at the time of said collision the said highway, and particularly the westerly or lower side thereof was obstructed and was in an extremely slippery and icy condition, and the trailer at the rear of the defendant's truck had several times shortly prior to said collision slid into the ditch at the right or westerly side of said mountain highway. That immediately before said collision the defendant's truck had been proceeding up a steep grade and long hill approximately one mile long. That in order to get said truck and trailer and the load thereon to the top of said hill in view of the foregoing facts it was necessary temporarily to drive the same on the easterly side of said highway, which was considerably higher than the westerly side being on the outside of the curve on the said highway, the same being the customary procedure under such conditions. That at the time of said collision the left wheels of said truck and trailer were several feet off of and easterly from the easterly edge of said highway. That at the time of said collision the defendant's truck was entirely stopped and the defendant, Max E. Snider, was very noticeably blinking the lights of said truck to attract the attention of the operator of said Rumford car. That at the point of said collision and to the south therefrom there was clear visibility by reason of a straight stretch of said highway for more than 800 feet, during which the operator of said Rumford car had a clear and unobstructed view of the defendant's said truck and the blinking lights thereof.

"(2) That the said collision involved herein was proximately caused or materially contributed to by the negligence of the plaintiff, Roy M. Rumford, in the operation of the Rumford Packard automobile at the time of and immediately preceding said collision; and said negligence was and is imputed to the other plaintiffs herein as to all except the third cause of action herein; said negligence of the plaintiff, Roy M. Rumford, being in the following respects:

"(1) In operating said Rumford Packard automobile at an excessive and unsafe rate of speed under the existing circumstances and conditions at the time of said collision, to-wit, at a speed of 55 miles per hour.

"(2) In driving said Packard automobile when the operator thereof was in an exhausted condition by reason of

having driven said automobile practically continuously for approximately two days and two nights from Los Angeles, California, to the point of said collision, so that said Roy M. Rumford was physically and mentally wholly unable to properly and competently operate said automobile at the time of said collision.

"(3) In failing and neglecting to keep a proper lookout for other vehicles upon said highway and particularly the defendant's truck.

"(4) In failing and neglecting to keep the plaintiff's said automobile under proper control.

"(5) In failing and neglecting to stop said automobile or apply the brakes thereof or slow the same down or turn the same to the left or to do anything to avoid a collision with the defendant's said truck when it was or should have been apparent to said Roy M. Rumford that a collision with said defendant's said parked truck was imminent or that there was danger of a collision with said defendant's truck, and that the plaintiff, Roy M. Rumford, failed and neglected to exercise reasonable care to avoid such collision when by the exercise of reasonable care he could have done so.

"(6) In operating said Packard car with defective lights.

"(7) In operating said Packard car with defective brakes.

"That the plaintiffs are therefore precluded from recovery herein by reason of the said negligence of the operator of plaintiff's said automobile, Roy M. Rumford."

We turn now to the truck driver's version of the accident. The truck and trailer had been turned over to him at Pasco, Washington, by another driver who had driven it from Spokane. Snider left Pasco about eleven o'clock p. m. on November 27th. The collision occurred on Three Creeks Hill, a hill a half or three-quarters of a mile in length and the steepest on the Satus Pass highway, with the exception of the grade culminating at the summit of the pass. The road was icy, and he had slipped sideways off the road in previous years and at Satus Pass that very night. We quote from testimony given by him while under examination by his counsel:

"Q. What was the temperature that night at the time of the accident, at least as compared with the freezing point? A. Well, I don't know what the temperature was, it was pretty cold. Q. Was it above or below freezing? A. I don't

know that. Q. It was pretty cold? A. It was cold, I know that. Q. It is true that at the time of the accident you were on your lefthand side which would be the easterly side of the highway? A. That's right. Q. Will you explain why you did that, Mr. Snider. A. Well, I tried to keep out of the ditch. I had been wanting to get on the far shoulder to get out of the ditch, to get on that curve where there was no ice where I could break through and to keep my trailer at the top of the curve. Had I not done it I might have got in trouble, and if I did I might have been all over the road. Q. Well, what do you mean when you say that? A. Well, when I got on the curve and my truck got in the ditch and pulled my trailer around. I would have been in both lanes then. Q. That is jack-knife across the highway, is that what you mean? A. That is right. Q. Would that or would that not have been quite dangerous at that point? A. I am afraid that it would. Q. And were you pretty much afraid that that would happen? A. That is the main reason why I went up. Q. I beg your pardon? A. That is the main reason I went up. Q. Why you turned to the left side? A. Why I pulled up on the high side. Q. You say that that is the main reason. Wasn't there another reason that also entered into that to some extent? A. What do you mean? Q. The super-elevation, is that another reason? A. Well, it pulls easier when you get above on the high side, but I wasn't thinking about that, but I was thinking about the ice. Q. Was it actually icy there at that time? A. It was. Q. For a moment let us refer to the road at that particular point where the accident occurred. *Just about where did the accident occur with reference to the top of Three Creeks Hill? A. Well, it is pretty close to the top, you don't have very far to go, maybe one hundred yards, maybe not that far. Q. About how far? A. It would be less than one hundred yards before you reached the top of the hill. Q. You had almost reached the top but not quite? A. That's right. . . .*

"Q. And now referring to the west side of the—First, with reference to the super-elevation, just about how much is there at that curve at the top of the hill? A. Well, I don't know how much there is there. It is 'suped' up pretty much. What I mean by that, it is pretty steep there, it gets up there pretty much. I don't know how much it is, two or three feet, about three feet. I do know that you will slide there if you are not careful. Q. The outside of the paved road is some two or three feet more elevated than the inside? A. Yes, sir, that is right. Q. And I believe other witnesses have stated—

there is no dispute about it—this accident happened on what might be referred to as a long gradual curve, is that right? A. That's right. Q. Just describe the shoulder on the west side of the road, which would be your righthand side. A. There isn't much of a shoulder there. Q. I beg your pardon? A. There isn't much of a shoulder, about eighteen or twenty inches, something like that. Q. And, then, what is there? A. Just a kind of drain ditch there. Q. Just describe about what size is that drainage ditch on your right hand side of the road as you went towards Goldendale. A. It varies and it goes from twelve inches to two feet deep. Q. At that particular place where the accident occurred, about what size is it there? A. Well, I wouldn't want to say, I don't know the exact figures; I didn't pay a heck of a lot of attention to it, although I imagine it run from eighteen to twenty inches deep. Q. With this particular equipment, assuming that this trailer to the rear had slid into a ditch of that kind at the right of the road, state whether or not there would have been—state what probably would have happened to this equipment? A. Well, just coming in there with this truck that way I probably would have gotten all over the road, that is what would have happened. Q. That is, it would probably jacknife your truck along the road? A. I imagine, if I didn't keep it straight. Q. Referring to the road to the south of the point of impact, which would be to the front of you as you were going towards Goldendale, we will say in daylight, what is the distance of visibility there; in other words, it is a long gradual curve; how many feet ahead can two vehicles approaching each other see each other? A. Oh, about five hundred and fifty feet, I imagine. Q. Five hundred and fifty feet? A. Yes. Q. Since the collision have you actually stepped that off? A. Yes, sir. Q. What was that distance? A. Well, I got 178 steps, that is what I got stepping it off across there. Q. How long was the step, would you say? A. A good long step just like you were stepping something right out, I imagine three foot steps. Q. About how far had you driven at the time of the impact after you had turned to your lefthand side of the road? A. I had gone about two truck lengths. Q. About two truck lengths? A. Yes, I hadn't got quite off of the road then. Q. By that you mean your entire equipment wasn't off the road? A. No, the trailer was still on the road a little bit. Q. What about your left wheels, where were they at the time of the impact? A. Do you mean front wheels? Q. The front wheels. A. They was off of the pavement, I got them off. Q. About how far

was your left front wheels off of the pavement at the time of the impact? A. Oh, I think I was a little over half off, maybe three or four feet. Q. About how wide is that truck? A. Eight foot outside. Q. As testified by the officers and also by Mr. Rumford, I believe that there was at least seventeen feet, nine inches of clearance to the right of your truck for any other traffic on the pavement; is that approximately correct? A. That is what they measured. Q. Would you say that there was at least that much space there? A. Yes, I think so. Q. Now, what was the situation with reference to your lights? Some contention is apparently made here that your lights were not on. Is that correct? A. They were on. The spotlight was on all the time. Q. Did you have your lights off at any time at all? A. Only just in flicking the switch up and down is all. Q. I will go into that in just a moment. But other than flicking your lights, did you have them off at any time? A. No, sir. Q. Just what lights was this truck equipped with? A. Well, she had *two headlights and one spotlight and there was a light up over the cab.*" (Italics ours.)

The truck had two front headlights and a spotlight under the left headlight. There was another spotlight higher up which had been almost wholly blacked out by the use of paint. There were also small clearance lights on the upper corners of the truck. Snider testified that there was no fog but only a morning haze:

"Q. What did you do, Mr. Snider, when you saw the Rumford car approaching? A. Well, I tried to warn him that I was in the wrong lane. Q. How? A. By batting my lights, raising my lights up and down and stuff like that, and when I couldn't do that I set my hand valve on the trailer and equipment there and I grabbed for a fuse to get it out and I tried to light a fuse. Q. There wasn't time for that? A. No, there wasn't time. I had the top off of it but I didn't have time to light the fuse. Q. Prior to the impact, were you moving or not? A. No, I was standing still when he hit me. Q. In other words, before the collision occurred you had stopped, had you? A. I stopped and put the hand valve on the trailer. Q. The hand valve, is that a hand brake that sets the brake on the trailer? A. Yes, the trailer brakes alone, it is an air brake. Q. You did not have those brakes on the truck but you did have the brakes on the trailer? A. Just on the trailer. Q. And both of them were completely

stopped at the time of and prior to the collision, were they? A. Standing dead still. Q. And you were blinking or flashing your lights quite noticeably? A. I was. Q. Let me see, when you did that, which lights that you have described were they that flashed? A. The headlights. Q. The front headlights? A. The headlights. Q. How fast would you say was the speed of the Rumford car? A. Well, I would have to guess at that. Q. What is your best estimate of its speed? A. Well, he was doing better than thirty-five, but I wouldn't know what to say his speed was, it would just be a guess if I said because he showed up pretty fast and it wasn't very long until it was all over with. Q. Just give us your best estimate of the speed of the Rumford car? A. Oh, I would say forty—forty-five—you can't tell how fast they are coming when you are looking at them."

Snider had affirmatively alleged that Rumford was driving at a speed of fifty-five miles per hour. He further testified, as follows:

"MR. HUTCHESON: (Q) All right, just describe, then, the course of the Rumford car. A. Well, when he came around the curve he pulled to his right and I thought he was going to go out and stop and then he pulled back to his left and I thought he was going to go by and about that time, I was still trying to get out and warn him. Q. Did the Rumford car at any time, any part of it at any time cross the yellow center line? A. Well, I don't know whether he did or not. I didn't —I can't say as to that. Q. Did the Rumford car at any time to any substantial extent get over to what would be your righthand side and his lefthand side of the yellow line? A. Well, as I say, I don't know whether he crossed the line because he went out to his right and out on the shoulder like he was going to stop and then he pulled back up in the road, and as to how far over he got I didn't pay any attention because he was coming from the shoulder to get back up there, he had pulled back up to the center line but whether he crossed the line I can't say that truthfully. Q. Did he at any time get far enough over to clear the truck? A. I thought at one time he was and I thought at one time he would get across but he pulled back across the road. Q. And then, what did the Rumford car do? A. He came right up and hit me. Q. That is, do you mean that it then turned back towards its right? A. Yes, either that or he was coming straight all the time. I thought he was coming back to the center of the road and he might not have. It looked to me he was coming

straight all the time but he pulled right to my right or the lane I should have been in. Q. What part of the two vehicles collided? A. Well, let me see, it was—he hit pretty much with the center of the car to my right front corner. Q. The center of his car? A. The center of his car hit pretty close to the frame part on the righthand side or where the spring shackle comes out there. Q. By the center, you mean the front of his car? A. That is right."

On cross-examination, defendant Snider testified, in part, as follows:

"Q. Were you familiar with that road? A. A little bit. Q. You knew if you were familiar with that road the distance that must be covered between the place where you went on to your lefthand side of the road and the place you got back to the righthand side, did you not? A. (witness nods.) THE COURT: What was your answer, please. THE WITNESS: Yes. MR. HAZEL: (Q) And you knew when you did that, you couldn't get back on the righthand side of the road in time to avoid an oncoming car? A. Sometimes I have got back, but I couldn't get back this time. Q. Well, you knew that there was some danger connected with that? A. There is. Q. And you knew that when you went out on the lefthand side of the road? A. I thought I could get over on the shoulder. Q. You knew that there was some danger to oncoming traffic at that particular point? A. I think I did. Q. Now, in connection with your testimony about the speed of the Rumford car, why, I think you attempted to be fair when you said you did not know and you guessed it to be more than thirty-five miles an hour; and then on further questioning you said it would be forty or forty-five miles an hour. A. That is right. . . .

"Q. Now, you say you applied the hand brake? A. Yes, the hand brake. Q. And you took your foot off of the foot brake? A. Yes, off of the foot brake when I applied the hand brake. Q. When you take your hand off of the hand brake does that stop them? A. Yes, sir. Q. What was the reason for doing that? A. Well, I was going to get out of there to give further warning. As I stated, I had fuses in my hand. Q. In other words, you put the brakes on the truck and trailer? A. Yes. Q. In other words, you were going to jump out of the truck? A. Yes. Q. And leave it standing right there? A. Yes. . . .

"MR. HAZEL: . . . (Q) Now, I would like to have your testimony straightened out as to the fog situation there im-

mediately prior to the collision. Was there some fog or not? A. I said no. Q. And you testified that it had all come down and frozen? A. Yes, that's right. Q. Is that right? A. Yes, that's right. Q. And there is a difference between fog and haze which you have mentioned? A. Well, haze—I don't know whether you have drove early in the morning but you have always got a haze. Q. And no fog? A. Well, it might have been termed fog by a weather expert but I would term it haze, and I didn't have to use my windshield wipers to keep it off. Q. But you say definitely there was no fog but there may have been some sort of a haze? A. That's right. Q. Which haze did not impair visibility at all? A. That's right. Q. Is that right? A. That's right."

On redirect examination, Snider testified, in part, as follows:

"Q. *Counsel asked you as to whether or not sometimes lights are turned off at short intervals to see whether or not other traffic is coming around a curve. Did you do anything like that on this occasion?* A. *Yes, I did when I went into the curve.* Q. *I beg your pardon?* A. *I did when I went into the curve.* Q. *When you went into the curve?* A. *Yes, sir; that is right.* Q. *About how long was that; how long were they off?* A. *Just turned them off and then turned them back on.* Q. *And how long was that before the collision occurred?* A. *How long?* Q. *Yes.* A. *In minutes?* Q. *Yes.* A. *Well, just long enough to take me to drive around that curve, maybe five or ten minutes.* Q. *I take it, that at that time five or ten minutes before the accident, the Rumford car and its lights, of course, were not visible at all?* A. *No, of course, he was on one side of the hill and I was on the other side of the hill.* Q. By the way, what approximately was the speed of your truck—not at the time of the collision but previously to the time of the collision as you were going up the hill? A. Twelve miles an hour. Q. If your trailer had slid off of the highway into the ditch on your righthand side of the road at this time and place, would it have been stuck there, or do you think you could have immediately driven right out? A. No, I would have been stuck. Q. What? A. I would have been stuck. Q. Why? A. Well, I would have been stuck down in the ditch and you couldn't get traction there. Q. Was the ditch bad enough so that you would have got stuck if you had gotten into it? A. That's right. Q. Let me see, about how long after the accident was it that Mr. Leo Hess, the gentleman sitting here, arrived at the scene of the

accident? A. Well, I wouldn't know that. Q. Were you there? A. No, I was down at Goldendale. Q. The point I was getting at was this: Had your truck and trailer been moved at all before he arrived? A. No. To my knowledge, no. MR. HUTCHESON: I believe that is all." (Italics ours.)

On recross-examination, he testified, in part, as follows:

"By MR. HAZEL: Q. I want to understand another part of your testimony here, Mr. Snider, under counsel's questioning. Now you say that you dimmed your lights or turned them off before going around the curve for an instant to determine whether or not there were any oncoming vehicles, and you did not see any, and specifically you did not see the Packard car of the Rumfords; is that right? A. That's right. Q. I understood you to tell me that you did see it at that time, and that is the reason you said in response to my questioning, that you thought there was some possibility of danger in putting your truck on the left hand side of the road; is that right? A. What I thought you meant by that, as I came into the curve. Q. As you came into the curve you turned your lights out? A. Yes, but not seeing anything and I did not see anyone, and when I had seen him and had gotten up as far as I had and could not get back I thought my entire alternative was to get further out. That is what I thought you meant. Q. I want to have your testimony clear. I have no intention of confusing you at all. A. That is what I meant to tell you. That is what I meant to tell you."

In the first cause of action, the jury returned a verdict against both defendants in the sum of $10,235; in the second cause of action, against both defendants in the sum of $4,249.09; in the third cause of action, against both defendants in the sum of $16,154.07; and in the fourth cause of action, against both defendants in the sum of $500. Defendants moved for judgment notwithstanding the verdicts or, in the alternative, for a new trial. Both motions were denied, and judgment was entered on the verdicts.

In moving for a new trial, the defendants urged that the verdicts were so excessive as to indicate that they must have been the result of passion and prejudice. However, we are not concerned with any such contention on this appeal. The refusal of the trial court to grant a new trial is not assigned as error. For that reason, we do not find it neces-

sary to discuss the medical evidence and the amount of the verdicts.

The assignments of error are as follows:

"The trial court erred:

"(1) In denying the motion of each of the defendants at the close of the evidence for judgment of dismissal and for a directed verdict in favor of the defendants upon each of the four causes of action separately.

"(2) In denying the motion of each defendant for judgment of dismissal notwithstanding the verdict as to plaintiffs' first cause of action.

"(3) In denying the motion of each defendant for judgment of dismissal notwithstanding the verdict as to plaintiffs' second cause of action.

"(4) In denying the motion of each defendant for judgment of dismissal notwithstanding the verdict as to plaintiffs' third cause of action.

"(5) In denying the motion of each defendant for judgment of dismissal notwithstanding the verdict as to plaintiffs' fourth cause of action.

"(6) In failing and refusing to enter judgment dismissing the action.

"(7) In entering judgment in favor of the plaintiffs and against each of the defendants on the first cause of action.

"(8) In entering judgment in favor of the plaintiffs and against each of the defendants on the second cause of action.

"(9) In entering judgment in favor of the plaintiffs and against each of the defendants on the third cause of action.

"(10) In entering judgment in favor of the plaintiffs and against each of the defendants on the fourth cause of action."

All of the above assignments are founded upon one or the other of two contentions: (1) that the trial judge should have held, as a matter of law, that no negligence on the part of the defendant driver was shown, and dismissed the action or directed a verdict for the appellants; (2) that plaintiff Rumford's contributory negligence was shown as a matter of law. Both of these contentions were stressed by defendants' counsel in supporting their motion for a directed verdict at the close of the evidence submitted in the case. The trial court's ruling on that motion was as follows:

"THE COURT: I think that the motion for directed verdict should be denied. *I am satisfied that there is sufficient*

*evidence of negligence on the part of the defendant driver to carry the case to the jury.*

*"As to the question of contributory negligence, I likewise feel that that is a question of fact to be decided by the jury. It seems to me, Mr. Hutcheson, that your whole argument as based upon the authorities which you cite is based on the acceptance of the testimony given by the defendant driver as the testimony to be considered. If as he said there was no fog and that there was visibility for three or four hundred feet there, it seems to me that your argument would be well taken; but where there is evidence in the record as given by the plaintiff driver to the effect that the first knowledge that he had of the existence of the truck at all was when he was within forty feet of it when suddenly the lights on the truck were illuminated and then for the first time he observed that the truck was there, and that it was too late for him to do anything, it seems to me that that presents a question which the jury may see fit—at least there is a conflict in the evidence—and the jury may see fit to follow that given by the plaintiff; and, therefore, if they determine to follow that evidence as being the facts in the case, it occurs to me that has presented a situation that he was without fault and he was just confronted with an emergency, and that he did all the things he could under the circumstances to avoid the accident, and if that is so, there wouldn't be contributory negligence.*

*"It seems clearly a matter for the trier of the fact and not as a matter of law showing that he was guilty of contributory negligence. It is not a question upon which reasonable minds would not differ, and, therefore, in my opinion, it is for the jury to determine."* (Italics ours.)

The same contentions were urged in support of defendants' motion for judgment notwithstanding the verdicts.

The only questions before us on appeal are: Did the court err in refusing to dismiss the action or to direct a verdict for the defendants; and did it again err in denying the defendants' motion for judgment notwithstanding the verdicts? Or, to put the questions in another way: (1) Was the evidence such that the jury was necessarily bound to find that the truck driver was not guilty of negligence which was the proximate cause of the collision; and (2) was the plaintiff Rumford shown, as a matter of law, to

have been guilty of contributory negligence which was the proximate cause of the collision?

We will first consider question (1): Was there evidence from which the jury was bound to find that the truck driver was not guilty of negligence which was the proximate cause of the collision? We have carefully examined and re-examined the whole of the extensive record, and we find the evidence much in conflict upon pivotal factual matters. There is, of course, no doubt of the fact that the truck driver had driven to, and was parked on, the left side of the road when Rumford appeared from the south.

Rem. Rev. Stat., Vol. 7A, § 6360-75 [P.P.C. § 295-1], reads as follows:

" § 6360-75. Driving to the right—Exceptions—Overtaking and passing—Obstructions. *Whenever any person is operating any vehicle upon any public highway of this state he shall at all times drive the same to the right of the center of such highway except when in the exercise of care in the overtaking and passing of another vehicle traveling in the same direction, or where an obstruction exists it is necessary to drive to the left of the center of such highway, providing the same is done with due care and right of way is extended to vehicles traveling in the proper direction upon the unobstructed portion of the public highway.*" (Italics ours.)

It will be noted that, while the statute, in broad and sweeping terms, requires a driver to drive· at all times to the right of the center of the highway, it contains two exceptions which we have emphasized in quoting it, to wit, (1) that he may drive on the left side of the center in overtaking and passing a vehicle traveling in the same direction, providing he does so in the exercise of due care, and (2) when, on account of an "obstruction" in the right-hand lane, it is necessary to drive to the left of the center of the highway, provided that, in so doing, he exercises due care. This statute was thoroughly discussed in the opinion in *Purdie v. Brunswick*, 20 Wn. (2d) 292, 146 P. (2d) 809, in which many other of our decisions are cited. Rem. Rev. Stat., Vol. 7A, § 6360-75, is quoted in the opinion, emphasizing its concluding lines as we have above italicized them.

The opinion in *Purdie v. Brunswick, supra,* goes on to say:

"The general rule pertaining to such situations is, as stated in an annotation appearing in 113 A. L. R. (1938) at page 1337:

" 'When there is an obstruction or pitfall on the right-hand side of the street, the driver of an automobile has the right to drive on his left around the obstruction and to be on the left-hand side of the street temporarily and for the necessary time and distance to enable him to pass the obstruction or pitfall, if in doing so he exercises the proper degree of care as regards others using the street in that immediate vicinity.'

"It is to be noted, however, not only that the temporary right thus permitted under the general rule is qualified by the duty to exercise the proper degree of care with regard to other users of the street, but also that, under the italicized portion of the statute quoted above, the person driving to the left of the center line of a public highway because of an existing obstruction has the additional duty to extend the right of way to the vehicle traveling in the proper direction upon the unobstructed portion of the road."

And later says:

"It is quite true that the mere fact of driving an automobile upon the wrong side of a street does not render the driver of the vehicle guilty of negligence as a matter of law. *Burlie v. Stephens,* 113 Wash. 182, 193 Pac. 684; *Bone v. Yellow Cab Co.,* 129 Wash. 503, 225 Pac. 440. However, we have frequently declared and consistently followed the rule that, where a motor vehicle lawfully traveling upon its own right-hand side of the road is struck by another vehicle traveling upon its left-hand side of the highway, the burden is upon the operator of the vehicle on the left, or wrong, side of the thoroughfare to explain how the collision occurred without his negligence. *Hartley v. Lasater,* 96 Wash. 407, 165 Pac. 106; *Crowe v. O'Rourke,* 146 Wash. 74, 262 Pac. 136; *Thomas v. Adams,* 174 Wash. 118, 24 P. (2d) 432; *Lauber v. Lyon,* 188 Wash. 644, 63 P. (2d) 389; *Bernard v. Portland Seattle Auto Freight, Inc.,* 11 Wn. (2d) 17, 118 P. (2d) 167.

"In *Hartley v. Lasater, supra,* we stated the rule by quoting from Berry, Automobiles (2d ed.), § 171 (2 Berry, Automobiles (7th ed.), § 2.477), as follows:

" 'One who violates the law of the road by driving on the wrong side assumes the risk of such an experiment and is required to use greater care than if he had kept on the right side of the road. If a collision takes place under such circumstances, the presumption is against the party who was on the wrong side. But the presumption is *prima facie*, and has the effect only of casting the burden of justifying his position upon the man who was on the wrong side.'

"This same text is cited in *Peterson v. Pallis*, 103 Wash. 180, 173 Pac. 1021, and *Martin v. Bear*, 167 Wash. 327, 9 P. (2d) 365.

"We have, moreover, explicitly held, as have other courts, that one driving on the wrong side of the road must exercise a greater amount of care than is required of him when driving on the proper side. *Segerstrom v. Lawrence*, 64 Wash. 245, 116 Pac. 876; *Eubanks v. Mullis*, 51 Ga. App. 728, 181 S. E. 604; *Kelly v. Schmidt*, 142 La. 91, 76 So. 250; *Gravel v. Roberge*, 125 Me. 399, 134 Atl. 375; *Greenbaum v. Costa*, 137 Md. 524, 113 Atl. 79; *Black v. Parke, Davis & Co.*, 211 Mich. 274, 178 N. W. 700; *Heryford v. Spitcaufsky*, 200 S. W. (Mo. App.) 123; 2 Berry, Automobiles (7th ed.), § 2.477, p. 559."

■ The principal legal question posed by the defendants' affirmative defense was whether or not the word "obstruction," as used in the statute, could be legally construed to include ice on the road. The trial court held that it could be so construed, and so instructed the jury; and we think, rightly. The instructions given to the jury were in accord with all of those portions of the opinion in *Purdie v. Brunswick* which we have above quoted.

Obviously, in order to accept the truck driver's excuse for driving on the left side of the center of the road, it was necessary for the jury to find, *as a fact*, that there was ice confronting him at the point where he turned and drove out of the right lane of travel into the left. The testimony as to that was very conflicting. Snider, the truck driver, testified that there was ice on the road. Rumford testified that there was no ice, but that the road, as he drove up from Goldendale, was wet. Stacy Reeves, a state highway patrolman stationed at Goldendale, left Goldendale for the scene of the accident shortly after it occurred, and drove the eight and

one-half miles to its location. He testified, in part, as follows:

"Q. What was the condition of the surface of the roadway at the scene of the accident? A. I would say it was wet. Q. Was there any ice discernible upon that roadway? A. There wasn't. Q. Was there any ice that you noticed between Goldendale and the scene of the accident? A. I did not."

On cross-examination, he further testified:

"Q. What was the situation at the time you first arrived there with reference to the road being icy or slippery? A. The road was wet but not icy. Q. Was it slippery from the standpoint of a moving car? A. No. Q. You would say that it was not? A. I would say that it was not. Q. Would it have been possible for it to have been rather icy or slippery, either one, at the time of the impact and to have sort of melted off before you arrived so as not to have been slippery at that time? A. I considered that same question and checked with the Highway Department at Goldendale who keep a record of the—they have a night patrol at that time of year and they keep a record of temperatures, and it was their opinion that there was no ice on the road at any time that night."

And further, as follows:

"Q. By the way, after you arrived there did you go back of the truck, that is, further north towards Toppenish to examine the condition of the road, down the hill further? A. I did not. Q. You did not? A. No."

Relying upon the testimony last quoted, appellants' attorney reasonably contends that Reeves' testimony, to the effect that there was no ice, is of little materiality, since it does not cover the exact place where Snider left the right side of the road and crossed the center line into the east lane of travel.

However, there was testimony which did cover that place. Defendants called, as their first witness, another highway patrolman, Earl Absher. He also was stationed at Goldendale and reached the scene of the collision before his fellow-patrolman Reeves. Absher testified, in part, as follows:

"Q. *Did you go back to see whether or not there was any ice? A. Yes. Q. Did you find any? A. No. Q. Was there any ice on the roadway at the time of the collision? A. No, sir.*" (Italics ours.)

Defendants called Edgar H. Canfield, county prosecutor, as its second witness, who was notified of the accident, proceeded immediately to the scene to officially investigate the matter, and subsequently filed a negligent homicide information against Snider. He testified, in part, as follows:

"Q. Did you yourself examine the roadway at that point for ice? A. Not immediately at the time that I got there, Mr. Hazel. It was probably forty-five minutes at least after I got there that I walked down the road far enough to see whether or not there was any ice. Q. When you did go, did you find any? A. There wasn't—"

As has been hereinabove shown by the quotations from the opinion in *Purdie v. Brunswick*, 20 Wn. (2d) 292, 146 P. (2d) 809, it is the law that the mere fact of driving a vehicle on the forbidden side of the road does not render a driver guilty of negligence as a matter of law. But if he collides with another vehicle while on the forbidden side of the center line, the presumption is against him and casts upon him the burden of justifying his driving on that side.

In this case, the truck driver attempted to justify his act by testifying that there was ice obstructing the right-hand lane of travel. As we have hitherto pointed out, there was much evidence that there was no ice there. The solution of these conflicts in the evidence was, of course, for the jury. The trial judge rightly told the jury, in his instructions:

"You are the exclusive judges of all questions of fact in this case."

There are other reasons why the court's refusal to direct a verdict for defendants was a sound ruling. The complaint alleged, among other things, that the defendant truck driver "failed and neglected to give any *timely* and *visible* or audible *signal or warning of the presence of defendants' truck on the east lane of said highway,*" and, in so plead-

ing, counsel presumably had in mind the following statutory provisions:

"*No person shall operate or stand any motor truck or combination of commercial vehicles upon a public highway where vehicle parking lights are required during the hours of darkness unless there shall be carried in such vehicle a sufficient number of electric lanterns or other signals, not less than three (3), approved by the state commission on equipment capable of continuously producing three warning lights, each visible from a distance of at least five hundred (500) feet for a period of at least twelve (12) hours.*

"Every such lantern *or signal* shall be of a type approved by the state commission on equipment and it shall publish lists of those devices which it has approved as adequate for the purposes of this section.

"*Whenever any motor truck or combination of commercial vehicles is disabled during the period when, and in a location where, parked vehicle lamps must be displayed on vehicles and such motor truck, trailer or semi-trailer cannot immediately be removed from the main traveled portion of a public highway, the driver or other person in charge of such vehicle shall cause such lanterns or other signals to be lighted and placed upon the public highway, one at a distance of approximately one hundred [(100)] feet in advance of such vehicle, one at a distance of approximately one hundred (100) feet to the rear of the vehicle and the third upon the roadway side of the vehicle,* except that if the vehicle is transporting inflammables or explosives no open burning flame shall be placed adjacent to any such last mentioned vehicle." Rem. Rev. Stat., Vol. 7A, § 6360-33 [P.P.C. § 291-39]. (Italics ours.)

It seems that the defendants carried such accessory warning "lanterns or other signals." However, they were not used. At any rate, the truck driver testified that, when he saw the Rumford car approaching, he tried to warn it by flashing his headlights on and off; that he grabbed "a fuse" to get it out and tried to light it, but that there was not time for that; and that he was able to get the top off the fuse, but was unable to light it. We take it that what he speaks of as a "fuse" was what the statute, above quoted, speaks of as "lanterns or other signals." It was then too late to comply with the last paragraph of the statute. The fuses or lanterns should have been lighted and placed one hundred

feet ahead of his "combination of commercial vehicles" when it stopped; for his "combination of commercial vehicles" was, we think, "disabled," within the meaning of the statute. The driver testified that he could not get back to his right side of the highway without incurring the danger of the trailer, and perhaps his truck, slipping sideways off the road. The position of the truck and trailer just prior to the collision will be discussed when we reach the second question in the case. That the "combination of commercial vehicles" was, to all intents, disabled is shown by Snider's testimony, as follows:

"Q. As Mr. Rumford testified it is true, is it, that with large equipment like that it would have been, of course, impossible for you to have gotten on across to the righthand side of the road?  A. *I couldn't have gotten back, it would have been impossible.* ·Q. What· did you do, Mr. Snider, when you saw the Rumford car approaching?  A. Well, I tried to warn him that I was in the wrong lane.  Q. How? A. By batting my lights, raising my lights up and down and stuff like that, and when I couldn't do that I set my hand valve on the trailer and equipment there and *I grabbed for a fuse to get it out and I tried to light a fuse.* Q. There wasn't time for that?  A. No, there wasn't time. I had the top off of it but I didn't have time to light the fuse.  Q. *Prior to the impact, were you moving or not? A. No, I was standing still when he hit me.* Q. In other words, before the collision occurred you had stopped, had you?  A. I stopped and put the hand valve on the trailer. Q. The hand valve, is that a hand brake that sets the brake on the trailer?  A. Yes, the trailer brakes alone, it is an air brake.  Q. You did not have those brakes on the truck but you did have the brakes on the trailer?  A. Just on the trailer.  Q. *And both of them were completely stopped at the time of and prior to the collision, were they?  A. Standing dead still.* Q. And were you blinking or flashing your lights quite noticeably?  A. I was.  Q. Let me see, when you did that, which lights that you have described were they that flashed?  A. The headlights.  Q. The front headlights?  A. The headlights.  Q. How fast would you say was the speed of the Rumford car?  A. Well, I would have to guess at that.  Q. What is your best estimate of its speed?  A. Well, he was doing better than thirty-five, but I wouldn't know what to say his speed was, it would just be a guess if I said because he showed up pretty fast and

it wasn't very long until it was all over with.  Q.  Just give us your best estimate of the speed of the Rumford car? A.  Oh, I would say forty—forty-five—you can't tell how fast they are coming when you are looking at them."  (Italics ours.)

There was nothing he could do but stay parked where he was.  As he said, it was impossible for him to cross to the right side.  Furthermore, as his truck at least was already well out on the eight-foot shoulder of the left side of the road, it was impossible for him to get the rear end of the trailer out of the east lane of the traveled portion of the roadway by turning further to the left.

■ The action of Snider, in flashing his headlights when he saw the Rumford car approaching, was commendable, but it cannot be accepted as a satisfactory substitute for having neglected to light, and properly place, the warning signals or flares, as required by Rem. Rev. Stat., Vol. 7A, § 6360-33, above quoted.  All automobile drivers are familiar with these signals and know, when they encounter them, that there is a "motor truck or combination of commercial vehicles" blocking the highway which "cannot immediately be removed."  The statute, by requiring the lights to be of such character as to be visible at a distance of at least five hundred feet, and to be lighted and one placed approximately one hundred feet in advance of a truck or combination of commercial vehicles, and one, one hundred feet to the rear thereof, is plainly designed to give a vehicle approaching from the front or rear at least six hundred feet to deal with such a situation.  In this case, if the jury gave credit to the testimony of Rumford and Mrs. Mann, as it had the right to do, the approaching driver had only about forty feet.  We are of the opinion that, in disposing of defendants' motion for a directed verdict at the close of all the evidence, the trial judge correctly ruled, as follows:

"THE COURT:  I think that the motion for directed verdict should be denied.  I am satisfied that there is sufficient evidence of negligence on the part of the defendant driver to carry the case to the jury."

We come now to the question as to whether or not the·
trial court erred in holding that the evidence in the case
did not establish Rumford's contributory negligence as a
matter of law.   It is said, in appellants' brief:

"Appellants' answer alleged contributory negligence of
Rumford as follows:   (1) excessive speed under the exist-
ing conditions, (2) driving for an excessive period in an
exhausted condition, (3) failing to keep a proper lookout,
(4) failure to keep the car under proper control, (5) failure
to stop or slow down or turn around the truck to avoid a
collision when danger thereof was or should have been rea-
sonably apparent, and (6) defective lights and brakes."

Appellants also alleged in their answer that the respond-
ent Rumford was guilty of negligence

"(6) In operating said Packard car with defective lights.
"(7) In operating said Packard car with defective brakes."

Appellants stoutly contend that all allegations, (1) to (7),
inclusive, were established as a matter of law.   We cannot
agree with that contention.   We will consider each allega-
tion in the order in which it is above quoted:

▮ (1) "Excessive speed under the existing conditions."
As to speed, there is no definite evidence which the jury
was compelled to accept.   The defendants alleged that Rum-
ford was driving at fifty-five miles per hour.   Defendant
Snider testified, as follows:

"Q. As Mr. Rumford testified it is true, is it, that with
large equipment like that it would have been, of course,
impossible for you to have gotten on across to the righthand
side of the road?   A. I couldn't have gotten back, it would
have been impossible.   Q. What did you do, Mr. Snider,
when you saw the Rumford car approaching?   A. Well, I
tried to warn him that I was in the wrong lane.   Q. How?
A. By batting my lights, raising my lights up and down
and stuff like that, and when I couldn't do that I set my
hand valve on the trailer and equipment there and I
grabbed for a fuse to get it out and I tried to light a fuse.
Q. There wasn't time for that?   A. No, there wasn't time.
I had the top off of it but I didn't have time to light the
fuse.   Q. Prior to the impact, were you moving or not?
A. No, I was standing still when he hit me.   Q. In other
words, before the collision occurred you had stopped, had
you?   A. I stopped and put the hand valve on the trailer.

Q. The hand valve, is that a hand brake that sets the brake on the trailer? A. Yes, the trailer brakes alone, it is an air brake. Q. You did not have those brakes on the truck but you did have the brakes on the trailer? A. Just on the trailer. Q. And both of them were completely stopped at the time of and prior to the collision, were they? A. Standing dead still. Q. And were you blinking or flashing your lights quite noticeably? A. I was. Q. Let me see, when you did that, which lights that you have described were they that flashed? A. The headlights. Q. The front headlights? A. The headlights. Q. *How fast would you say was the speed of the Rumford car? A. Well, I would have to guess at that. Q. What is your best estimate of its speed? A. Well, he was doing better than thirty-five, but I wouldn't know what to say his speed was, it would just be a guess if I said because he showed up pretty fast and it wasn't very long until it was all over with. Q. Just give us your best estimate of the speed of the Rumford car? A. Oh, I would say forty—forty-five—you can't tell how fast they are coming when you are looking at them.*" (Italics ours.)

Rumford testified as to speed and conditions, as follows:

"A. We proceeded out of Goldendale in a normal manner driving at approximately thirty to thirty-five miles an hour. The road was wet, although it hadn't been slippery. We had not observed any slipping or sliding up to this time. The yellow line in the middle of the highway had been fairly newly painted. It was very bright and very easy to follow the line. There was snow along the edge of the road, which made the edge of the road very visible."

Mrs. Mann testified that they were driving slowly when the lights of the truck flashed on and she said to her brother-in-law: "There's a truck on our side of the road."

It was amply shown by the evidence that the large steel front axle of the truck was bent, and seven or eight large bolts sheared off by the impact of the collision; also, that the steel tongue of the trailer was bent; also, that the large spring on the right front of the truck was bent. One of the witnesses who described these injuries to the truck was asked to give his opinion as to how fast the Packard must have been traveling in order to cause those particular results. It was objected that he had not been qualified to

answer that question; and the objection was rightly sustained.

Clearly, the speed at which Rumford was driving presented a factual question for the jury, and excessive speed was not shown as a matter of law.

It is also contended that Rumford was shown to have been guilty of contributory negligence as a matter of law, in that he drove for an excessive period in an exhausted condition. In this connection, much was said in argument, both oral and written, concerning the strain imposed on a driver by the many sharp curves on the Redwood highway. But Rumford drove on the Redwood highway on the day preceding the accident only four and one-half hours, that is, from a point a few miles south of Eureka to Crescent City, where the party left the Redwood highway and took the road to Grants Pass, Oregon. Mrs. Rumford then took over and drove for about two and one-half hours. Rumford denied that he was exhausted at any time during the trip and said he was not even tired; but, on being pressed by such questions as "Were you not some tired at least?" he replied, "Yes, perhaps some tired but not noticeably." Perhaps, the jury inferred that a pilot of B-25s and co-pilot of B-29s during the war, became somewhat accustomed to the long strain of continuous dangerous driving. At any rate, we do not think it can be reasonably contended that it was shown as a matter of law that Rumford drove for a long period "in an exhausted condition."

It is also contended that Rumford was shown as a matter of law not to have kept a proper lookout, since he did not see the truck until he was within forty feet of it. This contention is largely based upon the testimony of Snider that drivers of vehicles approaching each other on the curve could see each other more than five hundred feet away. Perhaps they could, if they were both actually negotiating the curve at the time and visibility was unimpaired.

As we have shown by Snider's own testimony, heretofore quoted, he turned off his lights when he went into the curve leading to the hilltop five or ten minutes before the

collision occurred, although he testified that they were off only momentarily. But he further testified:

"Q. About how long was that; how long were they off? A. Just turned them off and then turned them back on. Q. And how long was that before the collision occurred? A. How long? Q. Yes. A. In minutes? Q. Yes. A. Well, just long enough to take me to drive around that curve, maybe five or ten minutes. Q. *I take it, that at that time five or ten minutes before the accident, the Rumford car and its lights, of course, were not visible at all?* A. *No, of course, he was on one side of the hill and I was on the other side of the hill.*" (Italics ours.) (Statement of Facts, p. 278, lines 10 to 24, inclusive.)

Snider further testified, on direct examination:

"Q. For a moment let us refer to the road at that particular point where the accident occurred. Just about where did the accident occur with reference to the top of Three Creeks Hill? A. Well, it is pretty close to the top, you don't have very far to go, maybe one hundred yards, maybe not that far. Q. About how far? A. *It would be less than one hundred yards before you reached the top of the hill.* Q. You had almost reached the top but not quite? A. That's right." (Italics ours.) (Statement of Facts, p. 244, lines 29 and 30, p. 245, lines 1 to 10, inclusive.)

It is therefore apparent that Snider was parked when Rumford came over the hill, and that Rumford had no opportunity of seeing him from a distance of over five hundred feet away but only for less than one hundred yards, since Rumford could no more see through the hill than Snider could.

There is another matter affecting the question we are now discussing, and that is, a matter of visibility. Rumford, Mrs. Mann, and the two state patrolmen testified that it was quite foggy that morning at and near the location of the accident. Snider said it had been quite foggy, but, before the accident occurred, the fog had changed to the usual light morning haze.

In our opinion, it is not shown, by a preponderance of the evidence, that Rumford did not keep a proper lookout. It is perfectly clear that such negligence was not shown as a matter of law.

It is next contended that it was established as a matter of law that Rumford was guilty of contributory negligence, in that he failed to keep his car under proper control. This contention seems to be based upon his failure to stop the car, or avoid collision, by turning to the westerly side of the road. Rumford testified that he tried to steer the car to the left, but that the car did not respond to the turn of the wheel until just before the collision. He is corroborated by Snider, who testified that the oncoming car appeared to turn to the left and then swung back to the right and came straight at him. Rumford testified that he applied his brakes, and the evidence of one of the state patrolmen is to the effect that the wheels of the Rumford car left marks on the pavement leading straight toward the front of the truck, indicating that the wheels were locked by a sudden application of the brakes.

Appellants contend that Rumford had ample room to dodge the truck and trailer by pulling sharply to his left and using the westerly side of the roadway, and that he was guilty of contributory negligence in not doing so. This is the contention upon which the appellants principally rely on appeal. It is repeatedly asserted that the truck and trailer were in such a position as to allow a clear passageway on the westerly side thereof. In this connection, it is said, in appellants' brief:

"The truck was proceeding very slowly up the hill when Snider saw the Rumford car approaching. He immediately brought the truck to a complete stop. Its left wheels at the time of the impact were 3 feet 7 inches off and to the east of the easterly edge of the pavement on the gravel shoulder. The right wheels were 6 feet 9 inches to the left or east of the yellow center line. There was thus a clearance of 17 feet 9 inches from the right wheels of the truck to the west edge of the pavement—ample space for the Rumford car to have passed the truck."

The measurements, above mentioned, were jointly made by Patrolman Reeves and the prosecuting attorney who filed a negligent homicide by means of a motor vehicle information against Snider, and we do not question their accuracy. *But they appertain only to the position of the*

*truck.* The long trailer extended obliquely into the traveled portion of the roadway. Snider testified, in part, as follows:

"Q. About how far had you driven at the time of the impact after you had turned to your lefthand side of the road? A. I had gone about two truck lengths. Q. About two truck lengths? A. Yes, I hadn't got quite off of the road then. Q. By that you mean your entire equipment wasn't off the road? A. No, the trailer was still on the road a little bit." (Statement of Facts, p. 249, lines 4 to 12, inclusive.)

That the trailer was out in the traveled portion of the roadway more than a "little bit," is conclusively shown by photographs taken after the accident and introduced in evidence by both parties, showing the right rear wheels of the trailer were very close to the yellow center line of the roadway, and that its left rear wheels had not yet gotten off the road onto the shoulder; that is, that the rear of the trailer was entirely in the east lane of travel. While it would seem that the Packard could easily have cleared the truck, it would seem also that had it attempted to do so it might have hit the rear side wall of the trailer and caromed off into the ditch on the west side of the road.

It seems to us that it would have been a wildly dangerous thing for Rumford to have attempted to swing to the westward to pass the obstacle which confronted him. The truck and trailer were standing on the edge of a curve, in such a position as to completely obscure any view of the road behind them. For all Rumford knew, or could know, there might have been other vehicles approaching the truck and trailer from the rear which he would have met head on had he attempted to go around the truck and trailer. Unquestionably, two cars could not have safely met and passed between the trailer and the westerly ditch of the highway.

It is further contended that Rumford was shown to have been contributorily negligent, as a matter of law, (1) in that he was driving his car with defective lights, and (2) with defective brakes. We quote the only testimony we find, in the long record, concerning the condition of Rumford's lights and brakes:

"Q. Now, what was the condition of your automobile with particular reference to its headlights? A. Headlights and every other part of the automobile were in perfect condition. Q. How many miles had that car been driven up to the point of collision? A. I believe it was right at 10,400. Q. And what was the condition of the brakes on the automobile? A. Perfect. Q. Were they 'undersized or medium or oversized brakes? A. The brake drums on the front wheels were made for the car. They were ten inches. The brake drums on the rear wheels were made for the eight cylinder or larger Packard, and they were eleven inches. They would be considered oversized brakes for a car of that weight." (Statement of Facts, p. 59, lines 23 to 30, inclusive, and p. 60, lines 1 to 9, inclusive.)

No attempt was made to rebut the above testimony.

We are of the opinion that this cause was properly sent to the jury for decision, and that, since the jury, after considering the evidence, rendered verdicts for the plaintiffs in each of the four causes of action, the trial court properly entered judgment in accordance therewith.

The judgment appealed from will therefore stand affirmed.

MALLERY, C. J., BEALS, STEINERT, and JEFFERS, JJ., concur.