CHRISTENSON, Administrator, Appellant, vs. KLITZKE,
Respondent.*

*December 4, 1957—January 7, 1958.*

* Motion for rehearing denied, with $25 costs, on February 28,
1958.

For the appellant there were briefs by *Muriel Prazak* of Clinton, and *Geffs, Geffs, Block & Geffs* of Janesville, and oral argument by *Mr. Jacob Geffs* and *Miss Prazak.*

For the respondent there was a brief by *Dougherty, Arnold, Philipp & Murray* and *James T. Murray,* all of Milwaukee, and oral argument by *James T. Murray.*

STEINLE, J.  The collision occurred at about 1 a. m. on June 1, 1956, at a point approximately two miles northwest of Walworth on U. S. Highway 14. At the situs of the collision the highway runs northwest and southeast (for convenience, referred to herein as north and south). The pavement is of concrete construction,—22 feet 2 inches wide,—with a line in the center. There are shoulders on each side of the pavement. The highway is straight and level for three quarters of a mile north of the place of impact.

Evidence most favorable to the plaintiff and which the jury was entitled to deem credible indicates as follows: The weather was clear and the highway was dry. Ralph Johansen had been traveling in a southerly direction in his station wagon on the highway when trouble developed in the engine of the vehicle. He drove off the concrete and onto the right (west) shoulder and stopped his vehicle with its left side about three feet from the edge of the concrete. After he waited there for about fifteen minutes, a tractor-trailer driven by the defendant Frank R. Klitzke, who was traveling from Minnesota to Indiana, approached from the north. Klitzke stopped his vehicle on the concrete pavement alongside of Johansen's station wagon and inquired as to the difficulty. Johansen asked Klitzke to push the station wagon with the tractor-trailer. Klitzke backed the tractor-trailer and pulled in behind the station wagon. Both men observed that the bumpers would not match. Klitzke then drove the tractor-trailer ahead and moved it to a position in front of

the station wagon. Johansen testified that he did not believe that all of the tractor-trailer wheels were off the concrete pavement and on the shoulder when Klitzke stopped in front of the station wagon. After so stopping, Klitzke got out and handed a flashlight to Johansen. Klitzke told Johansen that there was a tow chain on the rear bumper of the trailer, and directed that as Klitzke backed up, Johansen was to unhook the chain, and when in position to attach the chain to the station wagon, he was to signal to Klitzke with the flashlight. Klitzke returned to the cab of the tractor and backed his unit for a distance of four to six feet. Johansen testified that when Klitzke was backing up, he noticed the lights of three vehicles that were coming from the north. When Klitzke stopped, Johansen observed that Christenson's pickup truck was getting nearer. He moved onto the pavement and waved the flashlight in the direction of Christenson. Klitzke's trailer extended for not more than two to three feet on the pavement at the time. When Johansen noticed that Christenson was not going to swing out, he jumped to the side with the chain in hand, and Christenson's truck struck the left rear wheel of Klitzke's trailer.

In his direct examination, Frank R. Klitzke testified *inter alia* that he was standing on the running board of the trailer when the collision occurred. The outside tire on the left of the rear axle of the trailer was struck by Christenson's truck.

In his recross-examination Klitzke testified in part as follows:

"*Q*. The sheriff's deputies asked you some questions? *A*. Yes, quite a few.

"*Q*. Did they ask you where you were, where your tractor and trailer was at the time of this collision? *A*. I don't know. I don't know if they did or not. When the pickup truck hit my tractor and trailer, it pushed it forward and sideways.

"*Q.* Sideways which way,—to your right? *A.* That's something that is going to be—you see, the unit was in a bit of a—we call it 'jackknife,' not setting perfectly straight. The trailer wasn't perfectly straight behind the tractor. As the pickup truck hit it, it went forward I would say, four, five, six feet,—something like that. . . . The whole rig went ahead putting it like at an angle like this (indicating) ; the front came out toward the road and the back end came out in the road, like this (indicating). Do you know what I mean?

"*Q.* I think I understand what you are testifying to. Now, before you started to back up, did you look to see if anyone was coming from behind you? *A.* No, I didn't open the door. I looked in the mirrors.

"*Q.* Were any lights coming behind? *A.* Not at the time I started backing up, no. I don't think so.

"*Q.* How far did you back up? *A.* That's a hard guess to make. Offhand, I would say four, five, six feet,—something like that."

In adverse examination Frank R. Klitzke testified in part as follows:

"*Q.* You could have waited until this traffic passed before you backed up, could you not? *A.* That's hard to explain to you. It was such a short period and at the same time you are looking forward and you are still looking forward when you put it in reverse and from the time you take your mind off putting the transmission in gear to look in the mirror to look back there is a time there I had rolled a few feet already and it doesn't come to your mind what is going on behind the truck.

"*Q.* Didn't you look in the mirror to see if there was any traffic before backing up? *A.* I don't believe I did, no, sir.

"*Q.* It is your testimony that you started to back up without first determining whether or not there was traffic coming from behind you, is that right? *A.* As I tried to explain to you, yes. I didn't see any skid marks on the pavement. I remember the rear wheels of the tractor making skid marks sideways. I don't know if the trailer did or not."

Don Ketchpaw, a deputy sheriff, testified that shortly after his arrival at the scene of the accident, Klitzke told him that "he was backing up and his left rear part of the trailer was partially on the pavement itself."

It appears further from evidence of record that when Christenson was about three fourths of a mile north of the place of the collision, he passed a semitrailer driven by John T. Brennan. Previous thereto Christenson had been following Brennan for about one and one-fourth miles. A semitrailer driven by Lawrence McAlester was following Christenson. The three trucks were traveling in line. McAlester testified that after Christenson had passed Brennan, he "swung back on his own side and kicked his lights from low to high beam." McAlester estimated Christenson's speed at "around 50 miles per hour." McAlester was attempting to pass Brennan immediately prior to the collision, but dropped behind Brennan before reaching the scene of the accident. Both Brennan and McAlester stopped at the place of collision. McAlester estimated Brennan's speed at 40 miles per hour and his own speed at 50 miles per hour. McAlester observed the clearance lights and left-hand light on Klitzke's unit before the collision. He saw no warning of a flashlight in the vicinity of the Klitzke unit.

The left rear corner of Klitzke's trailer was standing on the pavement immediately after the collision. Debris, principally in the form of loose dirt, was observed by officers who investigated the accident. The position of the trailer and the debris is indicated in a photograph taken shortly after the collision. After the impact Christenson's truck moved to a ditch directly across from Klitzke's trailer and was completely demolished there. There were no skid marks of Christenson's vehicle on the pavement. Klitzke testified that the wheels of his tractor made skid marks sideways, but that he did not know whether the trailer had made skid marks.

Johansen testified that ten minutes elapsed from the time that Klitzke first stopped to inquire as to Johansen's difficulty and the time of the collision. Although Klitzke carried fusees in his vehicle, no fusee flares were set out. Klitzke testified that had it been necessary he could have lit fusees and could have set them out before starting to pull Johansen out. When McAlester and Brennan arrived at the scene of the collision they immediately set out fusees as specified in sec. 85.06 (18), Stats.

The above evidence was partly contradicted by the testimony of Brennan, principally in that said witness estimated Christenson's speed, after passing Brennan, at 70 miles per hour, and in that he observed the waving of a flashlight from the direction of the vehicles of Johansen and Klitzke for probably fifteen seconds before the collision. The rule requires that under facts as here the court consider the evidence most favorable to the plaintiff and to the jury's findings. *Swanson v. Maryland Casualty Co.* (1954), 266 Wis. 357, 63 N. W. (2d) 743.

In its decision on motions after verdict the trial court expressed opinion (1) that it was proper under the evidence to have submitted to the jury the questions relating to causal negligence of the defendant with respect to the position of the tractor-trailer in relation to the roadway; (2) that the court had erred in submitting to the jury the questions as to causal negligence of the defendant with respect to putting out warning devices; (3) that the decedent's failure with respect to lookout and the decedent's speed at more than the limit of 55 miles per hour constituted extraordinary causal negligence which as a matter of law was at least equal to 50 per cent of the combined negligence of the drivers involved.

On this appeal the plaintiff contends (a) that there was sufficient evidence to warrant the finding of the jury that

the defendant was causally negligent with respect to putting out warning devices, and (b) that there was sufficient evidence to warrant the jury in finding that 60 per cent of the total negligence was attributable to the defendant.

There is an abundance of evidence indicating that the left rear part of the defendant's trailer was on the pavement just before and at the time of the impact, and that the court's submission of the question to the jury as to the defendant's negligence with reference to position in relation to the roadway, was proper.

The submission of the questions in the special verdict with respect to causal negligence of the defendant in regard to putting out warning devices was also proper.

Sec. 85.19 (1), Stats., provides in part:

*"Parking on Highway.* No person shall park, stop, or leave standing any vehicle, whether attended or unattended, upon any highway outside a business or residence district when it is practical to park, stop, or leave such vehicle standing off the roadway of such highway, . . ."

Sec. 85.06 (18), Stats., provides:

*"Lighting Devices for Stationary Vehicles.* No person shall during hours of darkness permit a truck, tractor, trailer, semitrailer, or bus to stand upon any traveled portion of a highway outside of the corporate limits of any incorporated city or village, unless there is displayed three of any one of the following lighting devices: Burning fusees, burning pot torches, lighted red lanterns. One shall be placed 10 feet to the left rear side of the vehicle, one placed approximately 125 feet to the front, and one placed approximately 125 feet to the rear of the vehicle to clearly indicate the location of such vehicle on the highway. Such lighting devices shall be so displayed during the entire time such vehicle is left standing. Every truck, tractor, or bus operated upon a highway outside of the corporate limits of any incorporated city or village shall carry in a place readily accessible

to the driver the lighting device so required. Said lighting devices shall at all times be kept in proper working order, and pot torches or lanterns shall be kept filled."

Sec. 85.31, Stats., provides in part:

"LIMITATIONS ON BACKING. The operator of a vehicle shall not back the same unless such movement can be made in safety, . . ."

Sec. 192.23, Interstate Commerce Commission—Motor Carrier Safety Regulations, 49 CFR, 1957 Suppl., p. 57, provides in part:

*"Emergency signals; stopped or parked vehicles.* Whenever for any cause other than disablement or necessary traffic stops, any motor vehicle is stopped upon the traveled portion of any highway, or shoulder thereof, during the time lights are required, except within a municipality where there is sufficient highway lighting to make clearly discernible persons and vehicles on the highway at a distance of 500 feet, the following requirements shall be observed:
"(a) The driver of such vehicle shall immediately place on the traveled portion of the highway at the traffic side of the vehicle, a lighted fusee, a lighted red electric lantern, or a red emergency reflector."

It is the contention of the defendant that there was insufficient time or opportunity for him to place out fusee flares when his unit was backing on a portion of the pavement or was stopped there. He maintains that his first stop alongside Johansen's station wagon was but momentary. He submits that when he backed up to ascertain whether the bumpers would match, his unit did not leave the pavement. He argues that when stopped in these instances there was no obligation on his part to put out fusees. He submits that when thereafter he had moved his unit ahead of the station wagon, it was completely off the pavement, and that when backing from such position his trailer did not enter upon

the pavement, hence there was no obligation to put out fusees for such operation.

Notwithstanding these contentions the jury was justified in concluding from the evidence that Klitzke was maneuvering on and partly off the pavement in the area for about ten minutes. From the evidence the jury was also entitled to consider that throughout all of the operations Klitzke's unit at no time was completely off the pavement. Klitzke stopped his vehicle wholly or partly on the pavement four times during the ten-minute period during which he was attempting to assist Johansen. Cognizant of the size of the trailer and tractor,—aware that the unit was likely to jack-knife when backed,—knowing that either a pushing or pulling operation would not be a momentary matter,—Klitzke ought to have sized up the undertaking in advance as one that would require maneuvering with stops on the pavement as the jury had a right to find that it did. Each of the stops on the pavement, excepting possibly the first, must be considered as part of the series of operations in the attempt to move Johansen's station wagon, and hence warning devices ought to have been set out in accordance with provision of sec. 85.06 (18), Stats., at the beginning of the undertaking when the first stop was made.

In *Vandenack v. Crosby* (1957), 275 Wis. 421, 430, 82 N. W. (2d) 307, it was held that a wrecker, stopped on the highway while conducting a rescue operation, was obligated to put out a warning device as required by the statute. It was there said:

"The fact that the wrecker was engaged in an emergency-rescue operation does not excuse the failure to place out fusees, burning pot torches, or red lanterns. It was held in both *Kastler v. Tures, supra* [ (1926), 191 Wis. 120, 210 N. W. 415] and *Cooper v. Teter, supra* [ (1941), 123 W. Va. 372, 15 S. E. (2d) 152], that a wrecker, which is stopped on a highway conducting a rescue operation, must

exercise ordinary care to warn other traffic of the obstruction of the highway by the wrecker. We deem that under the facts that existed in the present case the exercise of ordinary care by Clausen required that he place out fusees, torches, or lanterns 125 feet in front and to the rear of the stopped wrecker as required by sec. 85.06 (18), Stats.

"We consider that the case of *Hisaw v. Hendrix* (1950), 54 N. M. 119, 215 Pac. (2d) 598, supports our determination in this respect. There the operator of a wrecker stopped the same partly on the roadway for the purpose of walking across the highway to inspect the disabled car he came to rescue. The court held that he was negligent in failing to comply with the New Mexico statute requiring a truck to place out flares when it stops on a highway."

In *Robinson v. Briggs Transportation Co.* (1956), 272 Wis. 448, 459, 76 N. W. (2d) 294, it was held that the driver who estimated that his vehicle would not be stopped on the pavement for more than a minute and a half or two while giving a shot of ether to the motor vehicle, was obligated under the statute to place specified warning lights. In that case it was pointed out that:

"The statute, literally, imposes an absolute duty on the person responsible for a vehicle standing on the traveled portion of the highway in the hours of darkness to place specified warning lights. Such a person may have no time to place them before being struck and in such a case is excused for his failure to get them in position. 'In applying that statute the operator of the standing vehicle must, of course, be allowed sufficient time to enable him to place the prescribed fusee or lights.' *Bornemann v. Lusha* (1936), 221 Wis. 359, 364, 266 N. W. 789. To the same effect, *Szymon v. Johnson* (1955), 269 Wis. 153, 158, 69 N. W. (2d) 232."

As to the defendant's position that there was no obligation on his part to put out any warning devices, he relies on a statement in *Miles v. General Casualty Co.* (1949), 254 Wis. 278, 288, 36 N. W. (2d) 66:

"Both the statute and the rule were clearly intended to apply to a vehicle that has come to rest, and not to a truck which in the course of moving the obstacle from the highway, stops a moment or two to attach a chain to a disabled truck."

In the case at bar the defendant testified that he could have put out fusees, but did not consider that it was necessary. Obviously, he had ample time to do so. It was for the jury to determine as to whether under the circumstances and in the exercise of ordinary care he ought to have anticipated that at least part of his unit would occupy a stopped position on the pavement for more than a moment or two. The purpose of the statute in requiring such devices is to give notice to other users of the highway that a stationary vehicle is occupying a part or all of the driving area ahead. The display of ordinary lights is not a compliance with the statute. Since the jury was warranted in finding that Klitzke was in the area for about ten minutes, it was justified in inferring that the several stops there were more than momentary.

The observation in *Jess v. McNamer* (1953), 42 Wash. (2d) 466, 471, 255 Pac. (2d) 902, 905, is applicable to the situation here. It was there said:

". . . we have held that the display of ordinary lights is not a compliance with the statute. *Rumford v. Snider,* 31 Wash. (2d) 431, 197 Pac. (2d) 446; *Gies v. Consolidated Freightways, supra* [40 Wash. (2d) 488, 244 Pac. (2d) 248].

"McNamer had room to pass to the left of the stalled truck. However, he had the right to proceed in the right-hand lane upon the assumption that it was not obstructed, until warned to the contrary. *Moorehouse v. Everett,* 141 Wash. 399, 252 Pac. 157, 58 A. L. R. 1482. Here he did not receive such warning, and so was given no opportunity to utilize the ample driving space to the left."

The trial court correctly instructed the jury with reference to a driver's obligation under sec. 85.06 (18), Stats. In its

instructions the court also directed the jury's attention to the provisions of sec. 192.23 of the Motor Carrier Safety Regulations of the interstate commerce commission. We find it unnecessary to determine the matter of the relevancy of said safety regulations. There was ample evidence to sustain the jury's verdict with reference to the defendant's negligence in failing to observe the requirements of sec. 85.06 (18). It would have been error to have changed the answer of the jury with reference to the question in the special verdict relating to such consideration.

The trial court granted the defendant's motion to change the jury's answer with reference to the question relating to comparison of negligence. The jury had determined that the proportion of Christenson's negligence to that of the combined negligence of Klitzke and Christenson was 40 per cent. The court changed it to 50 per cent. Analysis of the court's decision respecting the matter reveals that the court considered that the jury had determined that Christenson had been exceeding the statutory speed limit of 55 miles per hour immediately before the collision. There was a conflict in the evidence as to whether Christenson was actually traveling more than 55 miles per hour, and the matter was for the jury to decide. Besides indicating the maximum statutory speed limit in its charge to the jury, the court correctly pointed out that any rate of speed less than the maximum may be unlawful if it is greater than is reasonable and prudent under the circumstances present. In the light of such instructions it cannot be said that the jury actually found that Christenson was traveling in excess of 55 miles per hour. The jury also found that Christenson was negligent as to lookout. With respect to its determination that Christenson was negligent as to speed, the jury may well have been of a mind that while he was not exceeding the maximum statutory speed limit, he was traveling faster than the circumstances warranted in view of the conditions ahead of

him, and which ought to have been observed by him. From the evidence the jury could properly conclude that Klitzke's negligence was greater than that of Christenson because Klitzke had backed the trailer unexpectedly to a position farther out on the pavement, and had stopped there just previous to the time when Christenson was justified in assuming that the trailer would not be backed, and that he would clear it without deviating from his straight course.

The trial court's ruling that Christenson was at least as negligent as Klitzke was based on the determination in *Hephner v. Wolf* (1952), 261 Wis. 191, 52 N. W. (2d) 390, to the effect that the plaintiff's causal negligence as to lookout and management and control was extraordinary and was at least as great as that of the defendant who had permitted his truck to be stopped on the highway. In the case at bar it cannot be held that the negligence of Christenson was extraordinary. The comparison was for the jury. Applicable is the following observation in the concurring opinion in *Schroeder v. Kuntz* (1953), 263 Wis. 590, 594, 595, 58 N. W. (2d) 445:

"Since our decisions in *Quady v. Sickl* (1952), 260 Wis. 348, 51 N. W. (2d) 3, 52 N. W. (2d) 134, and *Hephner v. Wolf* (1952), 261 Wis. 191, 52 N. W. (2d) 390, counsel in a number of subsequent automobile cases have cited such decisions as holding that the causal negligence of any operator of a motor vehicle who at night collides with a vehicle stopped or parked on the paved portion of a highway is, as a matter of law, at least equal to that of the operator of the other vehicle. The opinion in the instant case should clarify such misunderstanding of the holding in the *Quady v. Sickl* and *Hephner v. Wolf Cases,* and make it plain that the decisions in those two cases were based upon the particular facts there presented. . . .

"In the ordinary case of a moving motor vehicle colliding at night with another vehicle parked or stopped wholly or partially in the proper lane of travel of the moving vehicle, the comparison of negligence of the operators of such two

vehicles presents a jury issue in which it will not be held as a matter of law that the negligence of one is at least as great as that of the other."

In *Vidakovic v. Campbell* (1956), 274 Wis. 168, 174, 79 N. W. (2d) 806, it was said:

"The third point urged by the defendants is that the negligence of Vidakovic is, as a matter of law, at least equal to that of Campbell. The authorities cited in such contention are *Quady v. Sickl, supra,* and *Hephner v. Wolf* (1952), 261 Wis. 191, 52 N. W. (2d) 390. We attempted to make it clear in the later cases of *Schroeder v. Kuntz* (1953), 263 Wis. 590, 58 N. W. (2d) 445, and *Jennings v. Mueller Transportation Co.* (1955), 268 Wis. 622, 68 N. W. (2d) 565, that this court is not committed to the principle that the negligence of an operator of a motor vehicle who at night collides with a vehicle stopped on the paved portion of a highway is, as a matter of law, at least equal to that of the driver of the stopped vehicle. Each case of this kind must be decided upon its own facts, and in the vast majority of such cases the comparison of negligence is for the jury and not the court to determine.

"There is no extraordinarily negligent conduct on the part of Vidakovic such as was present in the *Quady* and *Hephner Cases.* We have above alluded to the high degree of negligence of the driver in the *Quady Case* whose car collided with the stopped vehicle. In the *Hephner Case,* Hephner's car collided with a stopped truck which he testified he saw when he was 200 to 300 feet away from it and yet did nothing to avoid a collision until he had arrived to within 50 to 75 feet of it.

"We have no hesitancy in holding that the comparison of negligence in the case at bar presented solely a jury issue."

We are constrained to hold that in the case at bar the apportionment of negligence was for the jury.

*By the Court.*—Judgment reversed, and cause remanded with directions to enter judgment upon the verdict as rendered by the jury.